IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2009 Session

## IN RE M.A.P. (D.O.B. 10/02/90); K.S.P. (D.O.B. 04/14/92); T.O.P. (D.O.B. 03/24/94); AND J.D.S. (D.O.B. 01/20/96)

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
## RUTH SAILS, SYLVESTER POLLARD, KENNY JONES, AND UNKNOWN FATHERS

An Appeal from the Juvenile Court for Shelby County
No. L3582     Herbert J. Lane, Sp. Judge

No. W2008-01352-COA-R3-PT - Filed July 10, 2009

This is a termination of parental rights case. The appellant mother of four children has a history of mental illness and substance abuse. The children were taken into state custody based on the mother's lack of safe and stable housing and her drug abuse. The children were then placed together in the home of their maternal grandmother and ultimately stayed in State custody for over eight years. For the first several years, the children's permanency plans required the mother to obtain drug treatment, attend parenting classes, seek treatment for her mental health issues, and provide a stable home for the children. At various times, these goals were accomplished, but at other times they were not. In 2006, the state petitioned the trial court to permit the mother to regain custody of the children, indicating that the mother had fulfilled her responsibilities. Around the same time, however, the mother tested positive for illegal drugs. Soon thereafter, the state filed the instant petition to terminate the mother's parental rights. After a trial, the trial court granted the petition for termination based on the ground of persistent conditions, finding that the State had made reasonable efforts to assist the mother and that the children's best interest would be served by termination. The mother as well as the children's guardian ad litem now appeal the termination. We reverse, finding that DCS failed to make reasonable efforts to assist the mother, particularly with respect to her underlying mental illness, and dismiss the petition to terminate her parental rights.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed and the Petition is Dismissed

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., joined. J. STEVEN STAFFORD, J., filed a dissenting opinion.

Ada Johnson, Memphis, Tennessee, for the appellant, Ruth Sails.

W. Ray Glasgow, Memphis, Tennessee, for the appellant, Guardian Ad Litem.

Robert E. Cooper, Jr., Attorney General & Reporter, Michael E. Moore, Solicitor General, Preston Shipp, Assistant Attorney General, and Amy T. McConnell, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

I. FACTUAL AND PROCEDURAL BACKGROUND

Respondent/Appellant Ruth Sails ("Mother") is the mother of the four children involved in this case: Melissa P. (d.o.b. 10/20/1990),[1] Kiara P. (d.o.b. 04/14/92), Temira P. (d.o.b. 03/24/94); and Justin S. (d.o.b. 01/20/96).[2] Sylvester Pollard is the father of Melissa, Kiara, and Temira, and Kenny Jones is the putative father of Justin.[3] Mother was never married to either Pollard or Jones. At all times prior to being taken into protective custody in January 2000, the children lived with Mother.

The appellate record in this case contains Mother's medical records, including records from Southeast Mental Health Center ("SEMHC").[4] The medical records from SEMHC show that Mother reported a history of mental illness since she was sixteen years old. In 1999, she was diagnosed with schizoaffective disorder; she suffered from auditory and visual hallucinations, such as voices telling her "I am bad" and "I need to be dead." Mother also had paranoid feelings, fear of going outside, feeling that "something is around me," insomnia, depression, and suicidal thoughts. She reported having taken a variety of prescription medications to control the symptoms of her mental illness. Mother also reported self-medicating with cocaine and marijuana. Consequently, she was diagnosed with "comorbid" addiction. Mother's medical records during that time period indicate that she and her children lived with her mother, the children's maternal grandmother, Edna Sails ("Grandmother"). They show that Mother had numerous "conflicts" with Grandmother. Mother's 1999 medical records state that inpatient treatment was indicated for her, but that Mother declined inpatient treatment because Grandmother refused to care for the children. Accordingly, Mother continued outpatient treatment and was prescribed medication for depression and psychotic symptoms.

---

[1] By the time of oral argument in this appeal, Melissa had reached majority.

[2] Mother also has an older daughter, Kimberly Rawls, who reached majority before the petition for termination was filed in this case.

[3] Although the fathers' parental rights were terminated as a result of the instant termination petition, they have not appealed the trial court's decision. Therefore, they are not parties to this appeal.

[4] Southeast Mental Health Center is sometimes referred to in the record as Southeast Mental Center, Southeast Professional Services, or SEMC. We will refer to the entity throughout as "SEMHC."

At some points in 1999, Mother was described in her SEMHC medical records as alert and cooperative, calm and compliant with treatment; some records show that she brought her children to the health care center and introduced them to employees. At other times in 1999, Mother is described in the records as "tearful" and "agitated and paranoid." In one instance, the SEMHC employee documented that Mother "[k]ept looking out the door in a suspicious manner." While Mother denied suicidal thoughts at that time, Mother conceded that her then 14-year-old daughter "watches her at night so she won't do anything to hurt herself." Throughout the 1999 SEMHC medical records, Mother describes her relationship with Grandmother as problematic and contributing to her stress. Mother said that Grandmother was "no support" and was a "big problem" in that Grandmother regularly spoke negatively to Mother and sought to "bring her down." At one point, Grandmother accompanied Mother to her visit to SEMHC, and the SEMHC employee observed a confrontation between them in which Grandmother and Mother were "yelling" at each other, and Grandmother said that she wanted Mother and the children "out of her home." Mother expressed to the SEMHC employee a desire to "better herself" and find a house or apartment for her and her children.

In November 1999, the Petitioner/Appellee State of Tennessee Department of Children's Services ("DCS") received a referral on Mother and her children. On January 25, 2000, DCS petitioned the trial court for temporary custody of Mother's four children. The petition stated that Mother had left the children unsupervised, that she was unable to provide a safe and sanitary home, and that Mother had a long history of drug abuse.[5] The petition also sought the appointment of a guardian ad litem for the children. On the same day, the trial court adjudicated the children to be dependent and neglected and gave DCS temporary custody; no guardian ad litem was appointed at that time.

On January 26, 2000, DCS placed the children on an "extended visit" in Grandmother's home. On March 7, 2000, the trial court found the children to be dependent and neglected based on Mother's drug use and her inability to provide a safe, stable home and adequate supervision, and it awarded legal custody to DCS. From that point forward, the children stayed in Grandmother's home nearly seven years, and would ultimately remain in DCS custody over eight years while Mother attempted to deal with her mental illness and comorbid addiction.

Over the years in which the children were in DCS custody, there were at least ten sets of permanency plans for the children. The first, dated February 23, 2000, were nearly identical as to all of the children. They required Mother to complete drug treatment and parenting classes and maintain visitation with her children. The plans noted that Mother had a history of mental illness, but included no details of her illness. Mother was given responsibility for obtaining her own mental health evaluation, following the treatment recommendations of her therapist, and maintaining contact with SEMHC or another agency. In connection with these permanency plans, DCS filed affidavits of "reasonable efforts" indicating that DCS's efforts consisted of instructing Mother to seek counseling/outpatient services for assistance with her mental issues. The goal of the initial set of

_____

[5]Mother admitted to a DCS caseworker that she had a long history of drug abuse.

permanency plans was to return custody of the children to Mother. Mother was present for the staffing of the initial plans, and she signed them on March 3, 2000.

Later that month, as specified in the permanency plans, Mother visited SEMHC for a mental health evaluation and for treatment. She reported to SEMHC that she was hospitalized after she lost custody of her children; she went off of her psychiatric medication, overdosed on illegal drugs, suffered depression, and was hearing derogatory voices and seeing shadows, especially at night. SEMHC prescribed Mother multiple medications to control the symptoms of her mental illness, and she was offered case management and periodic psychiatric and medical evaluation as well. Several months later, Mother's SEMHC medical records indicated that she could not be located.

Meanwhile, in August 2000, records show that Grandmother completed foster parent training and was approved as a foster parent for all of the children.

On September 12, 2000, revised permanency plans were drafted for the oldest three children, but not for Justin. Though Mother's requirements under the plans remained the same, the goal was changed to "relative placement." Mother was not present for the staffing of these plans. The plans state that Mother "is currently not participating in any treatment program, and [her] whereabouts are frequently unknown." Once Mother was located, DCS again told Mother that she needed to obtain drug and alcohol treatment and undergo a mental evaluation. DCS did not issue referrals for the recommended drug treatment or for any other services. On February 21, 2001, Mother had a mental evaluation at SEMHC, but apparently did not comply with the treatment recommendations. It is unclear whether DCS was aware that Mother was evaluated by SEMHC. On July 18, 2001, the DCS case manager, Everett Thornton ("Thornton"), filed an affidavit of reasonable efforts. Without noting that Mother had already had a therapeutic relationship with SEMHC for many years, the affidavit indicated that DCS referred Mother to outpatient counseling at SEMHC. The "reasonable efforts" affidavit stated that Mother did not follow through with the DCS recommendation.

In August 2001, Mother was apparently hospitalized for psychiatric reasons, suffering from auditory and visual hallucinations, paranoia, depression, and suicidal thoughts and attempts. Thereafter, beginning on August 28, 2001, Mother voluntarily underwent residential, long-term treatment for her drug addiction at the Cocaine and Alcohol Awareness Program ("CAAP"). While Mother was residing in the CAAP program, she underwent a psychiatric review at SEMHC. Though she reported being compliant with her psychiatric medications, Mother continued to have visual and auditory hallucinations, such as voices telling her what to do, and paranoia, including thoughts that people were trying to hurt her. The auditory hallucinations and paranoia culminated in a violent episode while Mother was residing at the CAAP program. Again diagnosed with schizoaffective disorder and comorbid substance abuse, Mother was given individual counseling and was prescribed multiple medications for depression and psychotic symptoms. Mother completed the residential CAAP program on April 12, 2002. Mother maintained sporadic visitation with the children while they continued to live at Grandmother's house.

On May 7, 2002, revised permanency plans were drafted for each of the children, including Justin. The permanency goal for Justin was changed to "return home" and "relative placement," while the goal for the other children remained "relative placement." The permanency plans include

notations that Mother "has recently completed [alcohol and drug] treatment, and reportedly is employed and has a stable home," and that Mother "reportedly has had an evaluation and is in treatment with a therapist at SEMHC." Mother was required to complete parenting classes, take the prescribed mental health medications, and to demonstrate the skills learned from her classes, treatment, and therapy. Mother was not present at the staffing of these plans. On May 14, 2002, Thornton filed another affidavit of "reasonable efforts." The affidavit did not list any services that DCS provided to Mother; rather, it listed only the actions that DCS required of Mother and stated that she had "reportedly completed A/D treatment at [CAAP]." The affidavit stated that DCS was providing unspecified kinship services to the family.

In February 2003, Mother again presented herself at SEMHC for admission for depression. After eighteen months of sobriety, she had apparently relapsed into alcohol and drug abuse a few days before coming to SEMHC; she sought to return to a recovery support program. Her recommended treatment included case management, individual therapy, and crisis intervention.

Not long after that, on March 11, 2003, DCS drafted a fifth set of permanency plans; Mother was present for the staffing of the plans. The plans indicated no responsibilities or recommendations for Mother, other than staying in contact with DCS and visiting with the children. Because the children were in a stable environment and Grandmother had agreed to provide long-term care, the goal in the plans was stated as planned permanent living arrangement ("PPLA") with a relative. The plans note that Grandmother "has completed Path training to become a kinship placement for the children."

At some point in 2003, Mother suffered a stroke. As a result, she lost her housing and became homeless. However, she maintained contact with SEMHC on her mental health issues. After this setback, SEMHC helped Mother find housing.

Another set of permanency plans was drafted on January 12, 2004. Mother was not present at the staffing and the plans state that DCS was unable to locate her. Again, the plans included no responsibilities or recommendations for Mother other than to visit the children and stay in contact with DCS. The goal remained PPLA with a relative. On January 13, 2004, case manager Danielle Jackson ("Jackson") filed an affidavit of "reasonable efforts." The affidavit of DCS's reasonable efforts listed no services to be provided to Mother by DCS, but instead reiterated the actions that DCS required of Mother and reported that Mother had completed another round of drug treatment at the CAAP program. It also claimed that unspecified kinship services were being provided to the family.

There are no other DCS notes on Mother for 2003 and 2004. However, her medical records at SEMHC during this time indicate that she was in regular contact with SEMHC regarding her ongoing mental health challenges. During the last half of 2003 and the first half of 2004, the records document over 25 contacts between Mother and SEMHC, some by SEMHC visits to Mother's home. During this time, in addition to mental health services, SEMHC provided non-financial assistance to Mother, helping her apply for housing, utility assistance, and resources for food, in the wake of Mother's hospitalization, presumably for the stroke. Despite these efforts by SEMHC and by Mother, by October 2004, Mother had dropped out of treatment at SEMHC.

On January 5, 2005, DCS drafted a seventh set of permanency plans; Mother was not present for the staffing. The goal of the plan for each child was changed to "Adoption," with a target date of January 12, 2006. At the time the plans were drafted, long-term relative placement was being "phased out" by the Department as a goal for children in DCS custody. The plans changed the goal to adoption because the parents were "not in compliance with [the] permanency plan," and Grandmother did not wish to adopt the children. The next day, on January 6, 2005, an affidavit of "reasonable efforts" was filed by DCS case manager Ida Dye ("Dye"). Like the earlier "reasonable efforts" affidavit, this affidavit listed no services provided to Mother by DCS; it again reiterated the actions DCS required of Mother, and stated that she had completed the CAAP program. It again claimed that unspecified kinship services were being provided to the family.[6]

The record indicates that Mother suffered another stroke on an unspecified date in 2005. There is no indication that DCS was aware of Mother's stroke. A July 2005 Juvenile Court order simply lists her whereabouts as "unknown." The order recites that DCS had made "reasonable efforts" in providing "needed services to both children and [M]other."

By September 2005, Mother told DCS that she was ready to regain custody of her children. To this end, on September 12, 2005, an eighth set of permanency plans was drafted for the three oldest children, but not for Justin. The goal of each plan was a dual goal of return to parent and adoption, with a target date of January 5, 2006. The plan listed numerous requirements of Mother; she was to have an alcohol and drug ("A & D") assessment, contact DCS or Grandmother to schedule visitation, locate safe and adequate housing, and maintain monthly contact with DCS and the children. A DCS affidavit of "reasonable efforts" was filed by Dye on September 13, 2005; it was virtually identical to the previous DCS "reasonable efforts" affidavits. Neither the reasonable efforts affidavit nor the permanency plans listed any steps to be taken by DCS to assist Mother in achieving the goals listed in the children's permanency plans.

An October 2005 Juvenile Court order states that Mother did not have housing "and reported that she is still abusing drugs." It also recited again that DCS "has made reasonable efforts in providing the needed services to both children and [M]other." The order does not indicate what services the trial court found were provided by DCS to Mother.

On March 14, 2006, DCS made its first referral for Mother; the referral was for her to receive an A & D assessment with Innovative Counseling & Consulting ("ICC"). On April 25, 2006, DCS made an additional referral for Mother to receive continuing treatment with the same provider.

On July 18, 2006, DCS prepared the ninth set of permanency plans for the children. This set of plans had the sole goal of reunification with Mother, because Mother had maintained stable housing and was participating in the out-patient drug treatment program at ICC. The DCS affidavit of reasonable efforts signed later that month listed no services to be provided by DCS to Mother, but noted that Mother was in counseling at ICC.

---

[6]Dye's affidavit was actually dated 2004, but apparently was supposed to be dated 2005 to correspond to the permanency plan dated January 5, 2005.

During her treatment at ICC, Mother took two drug screens. The first, taken on July 26, 2006, was returned with a negative result. The second drug screen was taken on August 5, 2006, the same day that Mother completed the A & D program at ICC. This second screen was returned with a positive result for cocaine. DCS apparently did not become aware of the positive drug screen until several months later.

On August 23, 2006, Mother's drug counselor at ICC wrote a letter to DCS stating that, although Mother had completed ICC's drug rehabilitation program, her attendance had been inconsistent, she failed to accept the serious effects of her drug addiction, and she reportedly had an "inability to integrate relapse prevention concepts" into her lifestyle. The counselor recommended that Mother participate in a more intensive drug rehabilitation program. Mother began ICC's recommended follow-up program but did not complete it.

Meanwhile, on August 18, 2006, the trial court appointed a guardian ad litem for the children for the first time since the children were taken into protective custody in 2000. Approximately a month later, a substitute guardian ad litem, the appellant herein, was appointed to act on behalf of the children.

Apparently still without knowledge of the August 2006 positive drug screen result, on October 31, 2006, DCS filed a petition in the trial court to modify custody of the children to remove them from state custody and return them to Mother's custody in her home. The petition stated that, since the removal of the children, "circumstances have changed in that the mother has attended and completed alcohol drug treatment and parenting classes. The mother has maintained adequate housing for the last year. The mother has continued to visit regularly."

For reasons not apparent in the record, in December 2006, the Juvenile Court entered an order requiring the children to visit with their father, Sylvester Pollard. Mother and Grandmother and Pollard apparently did not get along, and this change in the visitation arrangements with Pollard apparently upset the fragile balance in the family and created considerable stress for Mother, Grandmother, and the children. All of the children either refused visitation with Pollard or wanted visitation with him only on their own terms. On February 2, 2007, Mother took another drug screen, which was returned with a positive result for marijuana. Upon receiving the result of this drug screen, DCS attempted to refer Mother to several agencies for in-patient A & D treatment, but no beds were available at that time.

On February 2, 2007, the guardian ad litem filed an "emergency petition" to suspend the children's required visitation with Pollard, stating that the forced visitation with him had "proven disruptive" and was not in the children's best interest. The Juvenile Court granted the petition and suspended the children's visitation with Pollard. At the same time, the Juvenile Court dismissed DCS's earlier petition to return custody of the children to Mother, presumably because of her positive drug screen.

In the wake of the family disruption from the forced visitation with Pollard, in February 2007, after the children had lived with Grandmother for nearly seven years, DCS suddenly removed

them from Grandmother's custody. The reason for this action is not clear in the record.[7] After the children were removed from Grandmother's home, they were placed in foster homes, Kiara in one and the other three children in another. They did not return to live at Grandmother's house.

In May 2007, Mother entered another residential drug treatment program at CAAP. On June 11, 2007, while Mother was still in treatment at CAAP, DCS filed a petition to terminate her parental rights. In the petition, DCS asserted that Mother's rights should be terminated based on the grounds of failure to comply with the permanency plans and the existence of persistent conditions preventing the children's safe return to Mother's custody. The persistent conditions identified in the petition were that Mother either failed to enter A & D and parenting classes or, if she attended, she did not demonstrate skills learned in such classes. The petition also averred that it was in the children's best interest to terminate Mother's parental rights.

After the termination petition was filed, Mother remained in the A & D treatment program at CAAP and completed it in July 2007. Upon completion, she received a clean drug screen. When she was discharged, Mother moved in with Grandmother.

On July 18, 2007, after Mother had completed her A & D treatment at CAAP, DCS drafted a final set of permanency plans for the children. Despite the filing of the termination petition, these plans had alternate goals of reunification with Mother or adoption. At the time, Mother was living with her maternal grandmother. DCS noted that Mother was almost finished with her A & D treatment, she had maintained appropriate housing for the children, and the children wanted to return home to Mother. Under these new plans, Mother was required to continue out-patient A & D treatment, remain drug free, and maintain her stable housing.[8] Shortly thereafter, on July 26, 2007, Mother suffered a third stroke.

While Mother was recovering from the third stroke, on July 30, 2007, DCS filed an affidavit of "reasonable efforts," stating that DCS had assisted Mother with parenting and A & D treatment. On August 7, 2007, an attorney was appointed to represent Mother in the termination proceedings.

Several weeks before the scheduled trial on the termination petition, after Mother recovered from her stroke, she rented a three-bedroom home, paying the deposit and the rent for the first month. DCS later assisted her by paying for the next month's rent.

The trial on the petition to terminate Mother's parental rights took place on March 28 and 31, 2008. At the time of the trial, Melissa was seventeen, Kiara was fifteen, Temira was fourteen, and Justin was twelve years old. The DCS case manager, Danielle Jackson, testified from the DCS

---

[7]Apparently, referrals were made to DCS alleging that the 65-year-old Grandmother was physically abusing the teenage children by "whipping" them with her cane. At trial, however, the DCS representative indicated that the children were removed based on the fact that Grandmother had not completed required training hours, and because there were holes in the wall of her home. This is puzzling, in light of notations elsewhere in the record that Grandmother completed the foster parent training.

[8]By the time the July 2007 plans were drafted, Grandmother had become ill.

documents, describing why the children were taken into protective custody, outlining the circumstances surrounding the children's permanency plans, and relating the children's status. Jackson testified that, at the time of trial, Kiara was placed with foster mother Phyllis Ward, and that the other three children were placed with another couple, Mr. and Mrs. Gilchrest. She said that the children were doing "okay" in foster care, "as well as can be expected." Jackson believed that Kiara would consider being adopted, but stated that Temira and Justin did not want to be adopted. Adoptive parents had not been identified for Temira and Justin.

Jackson went through each set of DCS permanency plans, as set forth above, listing the requirements of Mother for each set of plans. For each plan, Jackson stated whether Mother completed the assigned task, such as obtaining a mental health assessment and taking the required medication, obtaining an A & D assessment and treatment program and maintaining sobriety, obtaining housing and taking parenting classes. Jackson acknowledged that DCS did not make any referrals for Mother to receive drug treatment until 2006, explaining that this was because Mother was seeking help for this problem on her own. She noted that Mother twice entered the residential program at CAAP on her own initiative. At the time of trial, the last time that DCS requested drug testing on Mother was in December 2006. Regarding Mother's mental health issues, Jackson said that the initial permanency plan required Mother to obtain a mental health assessment, which was done. Jackson testified that, to her knowledge, Mother went to SEMHC "a couple of times."

Jackson explained that, when the July 2006 permanency plans were drafted, DCS believed that Mother had completed her tasks and hoped that she had become able to care for the children. She had completed drug treatment. She had been living in her own home since February 2006, and DCS visits revealed that Mother's home was appropriate for the children. However, after it was discovered that Mother had a positive drug screen for cocaine in August 2006, DCS's plans changed. Jackson explained that, in October 2006, when DCS filed the petition to modify custody, DCS was unaware that Mother had a positive drug screen for cocaine.

Noting Mother's substance abuse relapses over the eight years in which the children had been in custody, Jackson felt that there were grounds for termination of Mother's parental rights because the conditions that existed at the time of the children's removal still existed and would not be remedied in the near future. Jackson admitted that Mother had maintained visitation with the children throughout the years in which they were in DCS custody, although during some periods of time the visits were sporadic. Jackson conceded that, at the time of trial, Mother was in a rental home, but noted that she had been living there for only three weeks, not long enough to establish stable housing. She admitted that, at the time of trial, Mother was employed, but pointed out that she earned only about $1,000 per month, $395 of which was consumed by her monthly rent. Jackson testified that continuation of Mother's relationship with the children would diminish the children's chances of having a safe and stable permanent home.

Jackson maintained that DCS had made reasonable efforts to reunify Mother with the children. In September 2000, July 2001, and May 2002, she said, Mother's whereabouts were unknown, and DCS's reasonable efforts consisted of its "diligent" attempts to locate Mother. DCS asked Grandmother where Mother was living, but Grandmother said that she did not know. DCS did not ask the children if they knew where Mother could be located. Jackson did not indicate in her

testimony that DCS ever contacted SEMHC for information about where Mother was living. Jackson noted that DCS referred Mother to drug treatment in 2006, and paid one month's rent for Mother in 2007, after the termination petition was filed. As to Mother's mental illness, Jackson said, DCS made no referrals, but it asked Mother to get herself a mental health assessment and follow through with recommended treatment.

DCS submitted evidence on Mother's August 2006 drug screen, which was positive for cocaine, and the December 2006 drug screen, which was positive for marijuana. A representative of ICC authenticated an August 2006 letter from another ICC employee, not present at the trial, indicating that Mother had completed the ICC out-patient A & D program but opining that Mother did not accept the seriousness of her addiction. The letter stated that Mother had failed to attend group therapy sessions and attended only one session of an 8-week parenting program.

A family treatment coordinator at Phoenix Foster Homes, Latasha Jones ("Jones"), testified about Kiara's foster placement after the children were removed from Grandmother's home. She said that Kiara was placed with Phyllis Ward. Ward's home was a loving and stable environment, and Kiara had made progress on her behavioral issues and had developed more self control. Jones noted that Kiara takes medicine for attention deficit disorder. On the issue of adoption, Jones characterized Kiara as torn between wanting a life with Ward and wanting to live with Mother, whom she loves. Jones said that Ward was willing to take all of the children if they needed to be together. When asked about her recommendation regarding whether the court should terminate Mother's parental rights, Jones declined to make a recommendation.

The foster mother of the other three children, Paulette Gilchrest, also testified. By the time of trial, Gilchrest had been fostering the three children for a year. On the issue of adoption, Gilchrest said that she was willing to adopt only Temira. She explained, however, that none of the children, including Temira, wanted to be adopted. Gilchrest was of the opinion that terminating Mother's parental rights would not "be a good thing" for the children, because they love Mother unconditionally. When the children came into her care, Gilchrest said, they began receiving services that they had not previously received, and they had benefitted from them. While the children have been in her care, Gilchrest said, they had visited Mother, and Mother had visited them. During some of the time, the visitation was required to be supervised, and Gilchrest supervised the visits. During those visits, Gilchrest said, Mother cooked dinner for them, and the children and Mother were all laughing and talking like a normal family.

Mother testified on her own behalf. She said that she understood her duties under the series of permanency plans and had complied with them. In 2000, after the children were taken into DCS custody, Mother went to a St. Francis outpatient center for treatment of her mental illness, and from there she was transferred to the St. Francis A & D unit. Mother testified about the two residential A & D programs that she attended at CAAP in 2001 and 2007, respectively. Contrary to the assertions of the ICC employee in the letter that was introduced into evidence, Mother said she in fact attended parenting classes as required under the permanency plans, because the parenting classes were included in some of her A & D programs.

Mother explained why she missed some of the staffings for the permanency plans. She missed some, she said, because she was in residential drug counseling at the time of the staffing. Other times, she did not receive notice of the meetings until the day of the meeting, which was too late because she was scheduled to work. Mother claimed that she at all times kept DCS informed of her whereabouts and after each staffing was told of the requirements of all permanency plans by telephone.

Mother testified that she had had stable housing for substantial intervals during the eight years in which the children had been in DCS custody; three times she had stable housing for two-year intervals. At times, however, she had to abandon her housing in order to participate in residential drug treatment or after suffering one of the three strokes she had during those years.[9] In April 2002, after she completed the A & D program at CAAP, Mother moved to a house on University and obtained a full-time job at the Memphis Pyramid. She suffered a stroke in 2003, and after recovering from the stroke, Mother moved to a house on Hale Street. She moved into another house of the same street in December 2004 and lived at that address over two years, until May 2007, when she entered the residential CAAP A & D program for the second time. After completing the second CAAP program, Mother moved in with Grandmother for a while. On March 8, 2008, about three weeks before trial, Mother moved into her then-current residence on Mount Olive. Mother said that she paid the deposit and the first month's rent, and that DCS had arranged to pay the rent for the second month. By the time of trial, Mother stated, she had been employed at Family Dollar since August 2007, working 35 to 45 hours a week and earning about $1,000 per month. Her rent for the three-bedroom home was $450 per month, and her car note was $225 per month.

Mother asserted that, for the first six years after the children were taken into DCS custody, she was given no assistance from DCS in carrying out her duties under the permanency plans. Despite the lack of appointed counsel, and despite the lack of assistance from anyone, Mother said, she completed everything DCS requested of her to the best of her ability and did it all on her own. After completing the second CAAP program, Mother noted, she suffered her third stroke and nevertheless maintained her sobriety. Mother testified that throughout the time in which the children were in DCS custody, she had maintained regular contact with them; during certain periods of time, she visited them on a daily basis. When the children were living with Grandmother, Mother spent most weekends with them, and sometimes walked them to school and picked them up from school.

Mother testified that, if she were given custody, she would be able to take care of the children. Mother said that she has been clean and sober from July 2007 until the time of trial, and that she attended regular meetings to address her drug issues. Mother was familiar with the school district in which she lived where the children would attend school. She was familiar with the children's medication and would commit to administering it appropriately. She indicated that her current employer was flexible, and that she would be able to take the children to their counseling sessions when necessary. Mother also indicated that her adult daughter, Kimberly Rawls, and other family members would help her with the children when she was at work. She said that the children

---

[9]Mother suffered strokes in 2003, 2005, and 2007. She said that the only lasting impairment resulting from the strokes was a slowness of memory.

had told her that they want to be returned to her custody. She thought that all involved could benefit from family counseling, but said that she did not believe that it was in her children's best interest to terminate her parental rights.

Mother's twenty-three-year-old daughter, Kimberly Rawls ("Rawls"), testified that if the children were returned to Mother's custody, she would assist Mother in taking care of them. Rawls said that, even when the children lived with Grandmother, Mother remained a part of their lives by helping take care of them. She said that Mother is a "totally changed person," that she loves the children, and that it would not be in their best interest to terminate Mother's parental rights.

All four children testified at trial. Each expressed love for Mother and a desire to be returned to her custody, and none wanted to be adopted by anyone else. Justin, twelve years old at the time of trial, and Temira, fourteen years old, said that they would not object to staying in foster care until the end of the school year, but wanted to live with Mother afterwards. Temira indicated that, if Mother's rights were terminated, she would agree to be adopted by Gilchrest.

Kiara, almost sixteen years old at the time of trial, testified that Mother was "the only person that has been there for me. And she's not only my mom, she's my friend. . . . She tells me not to give up." Kiara expressed admiration that Mother "had overcome a lot of adversity," stating, "People said that she wasn't going to make it and she made it. It was for us. I think she's been proving that she's ready for us." Kiara testified that during the time in which the children were living in foster care, Mother found ways to spend time with them, taking them to the park, cleaning the house, and helping with anything that they needed.

Seventeen-year-old Melissa testified that Mother had completed all of the tasks expected of her by DCS and that she was "praying" to be returned to Mother's custody. Melissa brought with her to trial a prepared letter to the trial judge, which she was allowed to read into evidence. In the letter, Melissa pleaded with the trial court to return her and her siblings to Mother's custody. She explained her reasons for wanting to be returned to Mother; she noted that Mother "has gotten a job and her own home," and that she had been sober and drug free for a year. Observing that Mother had "done everything that the Court has asked her to do," and that her homes had passed inspection each time they were checked, Melissa assured the trial court that Mother had "gotten her life together." She stated:

> The love that we have for our mother, and the love that she has for us, are so strong. . . . I, myself, need that love every day, not just every other weekend. . . . Please find in your heart . . . to give us back to our mother. I would mean a great deal to us all.[10]

At the conclusion of the proof, the trial court terminated Mother's parental rights based on the ground of persistent conditions. The trial court reasoned:

---

[10]According to the guardian ad litem, Melissa moved back in with Mother the day she reached majority on October 2, 2008.

Seldom do I see a case that takes this long to work through some resolution. The mother did start out making – she tried to make some of the things that were being required of her, and I think she met with some degrees of success.

She may not have done anything that was requested of her, but in '06, the Department was satisfied that she'd done enough that they were going to try to put the children back in her home because she had completed her drug program. And everybody thought she was on her way to recovery. But she turned up positive on a drug screen.

So on one hand, she's doing what's required of her. But she's not following (quantifying) the lifestyle that she was leading, which is what led to the children coming out of her custody to begin with.

\*\*\*

So the children are left in the custody of the State. Even after '06, when the State filed that Petition to modify, right up until the time that the termination was filed, it does not appear that the mother's situation was much improved.

So even if I agree that she had met the conditions, if she substantially complied with the permanency plans, I still feel like that her condition existed at the time that the termination was filed in June of '07. It was the same condition that led to the children being removed back in '01 [sic].

So I'm afraid that the mother's condition is pretty much the same as it was, and this doesn't benefit the children.

\*\*\*

And I just cannot understand why this mother after eight years wouldn't have been knocking the door down saying, what do you need me to do? I'm ready to get my children back.

\*\*\*

. . . While she tells [DCS] that she wants her children back, while she says I love my children, I'll do anything in the world for them, her actions don't demonstrate that.

Thus, the trial court was concerned that the children had been in DCS custody since 2000, and that Mother had not been prepared to take them home at the time the termination petition was filed in 2007. Although the trial court gave Mother "the benefit of the doubt" and determined that she had complied with the permanency plans, it held that the conditions that led to the children's removal still persisted as of the date of the termination petition.

The trial court also found that terminating Mother's parental rights was in the best interest of the children. The trial court acknowledged that assessing the best interest of the children was the "harder problem," because the children all testified that they did not want to be adopted and that they wanted to continue their relationship with Mother. Despite the children's stated desires, however, the trial judge observed that "this is like any other case that I've seen in the case of dependent and neglect, or even abuse cases. Children love their parents no matter what. Children don't want to be separated from their parents. So the Court has to determine what is actually in their best interest." Ultimately, the trial court held that it was in the children's best interest to terminate Mother's

parental rights, opining that, "if they can get permanence for a day, a week or a month, they deserve that."

On May 21, 2008, the trial court entered an order consistent with its oral ruling, terminating Mother's parental rights on the grounds of persistent conditions. Tenn. Code Ann. § 36-1-113(g)(3) (2005). Expanding on its oral finding that Mother had substantially complied with the permanency plans, the trial court specifically found that, as of the date of the October 2006 DCS petition to modify to return custody to Mother, she had attended and completed A & D treatment and parenting classes, and had maintained stable housing for a year. The trial court also recited the testimony to the contrary proffered by DCS. In addition to its oral findings, the trial court stated that DCS "made reasonable efforts in assisting [Mother] with the alcohol and drug and parenting components of the permanency plans by referring [Mother] to Innovative Counseling (ICC)," noting three A & D referrals in 2006 and three referrals for parenting classes. The trial court noted testimony by DCS case worker Jackson "that the Department has been working with Ruth Sails for *eight years* to attempt to remedy the reasons that necessitated foster care for said children, and continued to make efforts to remedy said conditions after the filing of the termination petition." (emphasis in original.) Despite this, the trial court concluded, the same conditions that existed at the time of removal still exist, "and Ms. Sails has not done what is necessary for the children to be returned to her." The trial court stated that it had taken into account the children's stated desire to be returned to Mother, but nevertheless concluded that "aging out in foster care State custody is not in said children's best interests; that the children need permanence; that [Mother has] not done what is necessary; and that the Department did everything they could to assist [Mother]." On this basis, the trial court terminated Mother's parental rights. Both Mother and the children's guardian ad litem now appeal the trial court's decision.

## II. Issues on Appeal

On appeal, Mother argues that clear and convincing evidence does not support the trial court's finding that persistent conditions existed that prevented the children's safe return to her home. She argues further that, even if the conditions did persist, this is negated by the fact that DCS did not exercise reasonable efforts in helping her overcome her mental illness and her drug addiction, which was necessary for her to regain custody of the children. Mother further argues that terminating her parental rights was not in the best interest of the children, particularly considering that the children do not want to be adopted, and that their adoptive placement was uncertain at best. The guardian ad litem, arguing on behalf of the children, raises these same issues, emphasizing that DCS failed to assist Mother in coping with her mental illness, and that its other efforts to reunite Mother with the children simply were not sufficient under the circumstances.[11]

---

[11]After oral argument, this Court *sua sponte* directed the parties to file supplemental briefs to set forth the basis upon which Special Judge Lane, a juvenile court referee, exercised his authority over this case. The order was signed by "Herbert J. Lane, Special Judge," but the record does not otherwise indicate the basis for his authority to hear the case. According to the parties, Special Judge Lane was appointed as the judge pursuant to Tennessee Code Annotated §§ 17-2-118(f)(2) and/or 17-2-122(b), which authorize the appointment of a referee "where a judge finds it necessary to be absent from holding court." *See In re Valentine*, 79 S.W.3d 539, 544-45 (Tenn. 2002). The record contains no
(continued...)

## III. STANDARD OF REVIEW

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the federal and state constitutions. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). This right is fundamental, but it is not absolute; it continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 638 (Tenn. Ct. App. 2004).

Termination proceedings in Tennessee are governed by statute. In order to terminate a parent's rights, DCS must prove two things: (1) the existence of at least one of the statutory grounds for termination, and (2) that the termination of the parent's rights is in the children's best interest. Tenn. Code Ann. § 36-1-113(c)(1) – (2) (2005); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re A.W.*, 114 S.W.3d 541, 544 (Tenn. Ct. App. 2003); *In re C.W.W.*, 37 S.W.3d 467, 475-76 (Tenn. Ct. App. 2000), *abrogated on other grounds by Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

"No civil action carries with it graver consequences than a petition to sever family ties indelibly and forever." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *4 (Tenn. Ct. App. Mar. 9, 2004). Because the stakes are so high, the statute requires that each of these elements be proven by clear and convincing evidence, to minimize the risk of an erroneous decision. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence" is evidence which "eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence." *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995), *overruled on other grounds by In re Swanson*, 2 S.W.3d 180 (Tenn. 1999). It produces in the fact-finder a firm conviction regarding the truth of the facts to be established. *In re C.M.M.*, 2004 WL 438326, at *4.

Because of the heightened burden of proof required in termination proceedings, our customary standard of review must be adapted in such cases. Ordinarily, under Tennessee Rule of Appellate Procedure 13(d), the trial court's findings of fact are reviewed *de novo* upon the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App.

---

[11](...continued)

such appointment. The Tennessee Supreme Court has discussed at length the proper procedures to be followed when appointing a special judge under these statutes, and has emphasized the requirement that a judge's absence be "necessary" to warrant the appointment. *Ferrell v. Cigna Prop. & Cas. Ins. Co.*, 33 S.W.3d 731, 737-38 (Tenn. 2000). Nevertheless, even if the proper procedures are not followed under the statute, the special judge's decision will be binding on the parties if he is acting as a *de facto* judge, i.e., in good faith under color of right. *See Ferrell*, 33 S.W.3d at 739; *Tenn. Dep't Human Servs. v. A.M.H. (In re A.B.)*, 198 S.W.3d 757, 764 (Tenn. Ct. App. 2006). In this case, regardless of whether the proper procedures were followed in appointing Special Judge Lane to preside over the case, he was appointed under color of law, and there is nothing in the record indicating that he acted in bad faith. Therefore, we find that Special Judge Lane acted as a *de facto* judge, and we consider the merits of this appeal.

-15-

P. 13(d). Upon reviewing a termination of parental rights, we must determine whether the trial court's findings of fact, made under a clear and convincing standard, are supported by a preponderance of the evidence. *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). Thus, we must "draw a distinction between specific facts and the combined weight of these facts." *In re Audrey S.*, 182 S.W.3d at 861 n.26. We must presume that the trial court's specific findings of fact are correct, so long as they are supported by a preponderance of the evidence. We "must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion." *Id.* This Court affords great weight to the trial court's credibility determinations, and it will not reverse such determinations absent clear evidence to the contrary. *See Jones*, 92 S.W.3d at 828.

IV. ANALYSIS

We address first the argument raised by both Mother and the children's guardian ad litem that the trial court's decision to terminate should be reversed because DCS did not carry its burden of proving that it made reasonable efforts to reunify Mother with the children.

The concept of family is fundamental in our society. Public policy strongly favors allowing parents to raise their children free from unwarranted governmental interference. *Belloti v. Baird*, 443 U.S. 622, 638, 99 S. Ct. 3035, 3045 (1979); *Hawk*, 855 S.W.2d at 579. In light of this principle, the statutes defining the circumstances under which the State may intervene in the parent-child relationship make it clear that separating parent and child is a remedy of last resort and that the Department must make "reasonable efforts" to preserve, repair or restore the parent-child relationship where possible. *In re C.M.M.*, 2004 WL 438326, at *6.

The Department is not required to make reasonable efforts to reunify parent with child in every instance in which a child is removed from a parent's custody. For example, reasonable efforts are not required of the Department where there are statutorily-defined "aggravating circumstances"[12] or other specified grounds for termination.[13] "However, when the termination proceeding involves grounds that implicate the Department's obligation, establishing that it made reasonable efforts to reunite the child with his or her parents is an essential ingredient of the Department's case." *Id.* at *7. The State has the burden of proving that DCS made reasonable efforts even if the parent has not questioned it. *Id.*; Tenn. Code Ann. § 37-1-166(b).

---

[12]These include severe child abuse, as defined in Tenn. Code Ann. § 73-1-102, "aggravated circumstances" under Tenn. Code Ann. § 36-1-102(9), and crimes against a child's sibling or the child's other parent under Tenn. Code Ann. §§ 37-1-166(g)(4)(B) and 36-1-113(g)(7).

[13]*See, e.g.*, Tenn. Code Ann. § 36-1-113(g)(5)and (6) (parent's lengthy incarceration); Tenn. Code Ann. § 36-1-113(g)(8) (parent with impaired mental capacity).

In this case, Mother's parental rights were terminated on the grounds that persistent conditions prevented the safe return of the children to her home.[14] This ground for termination is one which requires the Department to prove that it made reasonable efforts to reunify Mother with the children, under Tennessee Code Annotated § 37-1-166. *Id.* at *7 n.23.

It is important to note that the responsibility lies in the first instance with the parents to rehabilitate themselves and remedy the conditions that necessitated removing the children from their custody. *See In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006) (citing *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *12 (Tenn. Ct. App. Nov. 18, 2002)). DCS's efforts need not be "Herculean." *Id.*[15] Often, however, "[t]he success of a parent's remedial efforts . . . depends on [DCS's] assistance and support." *Id.* at 518. DCS is required by statute to make "reasonable efforts" to reunify the family and make it "possible for a child to safely return to the child's home." *See* Tenn. Code Ann. § 37-1-166(g)(2)(B) (2005).

The term "reasonable efforts" is statutorily defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). Whether DSC has made reasonable efforts to provide services to enable a child to return safely to the home is determined on a case-by-case basis in light of the circumstances of the case. *In re C.M.C.*, No. E2005-00328-R3-PT, 2005 WL 1827855, at *9 (Tenn. Ct. App. Aug. 3, 2005). The factors considered in assessing the reasonableness of DCS's efforts include the following:

---

[14] The "persistent conditions" ground for termination of parental rights exists when:

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A) (2005).

[15] At times, a parent whose rights have been terminated may argue that DCS did not make reasonable efforts, when in fact DCS made considerable efforts and the parent impeded DCS's efforts to provide assistance. *See, i.e., In re F.C.M.*, 2007 WL 465052, at *8 (Tenn. Ct. App. Feb. 12, 2007). In other instances, DCS makes remarkable efforts, which the parent nevertheless argues were not reasonable. *See, i.e., In re R.F.*, 2007 WL 957339, at *9-10 (Tenn. Ct. App. Mar. 30, 2007).

(1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way. The Department's employees must use their superior insight and training to assist parents with the problems the Department has identified in the permanency plan, whether the parents ask for assistance or not." *In re C.M.M.*, 2004 WL 438326, at *7 (citing *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002)).

The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable. *Id.*, at *8. This requires the State to present evidence on the DCS reunification efforts "to enable the trier-of-fact to conclude, without any serious or substantial doubt, that the Department's remedial efforts were reasonable under all the circumstances." *Id.*

Tennessee Code Annotated § 37-1-166(c) outlines the procedure for DCS to prove the reasonableness of its reunification efforts. Under the statute, the Department is required to file with the court a "reasonable efforts" affidavit identifying specific services that have been determined to be necessary to reunite the family, as well as services that DCS has actually provided to the parents and the child. The "reasonable efforts" affidavit must address whether the Department had a reasonable opportunity to provide the needed services and, if not, why the services were not provided. Tenn. Code Ann. § 37-1-166(c); *In re C.M.M.*, 2004 WL 438326, at *8.

In light of these standards, we examine whether DCS carried its burden in this case of proving by clear and convincing evidence that its efforts to reunify Mother with her children were reasonable under the circumstances.

When this family came to the attention of DCS in 1999, and when the children were taken into protective custody in early 2000, it is undisputed that DCS was aware that one of the problems that gave rise to Mother's failure to properly care for the children was her mental illness. The first permanency plan, dated February 2000, states that Mother "has a history of mental illness" and notes her relationship with "her counselor at SEMHC." Despite this knowledge, there is no indication in the appellate record that DCS at that time accessed Mother's medical records from SEMHC, or otherwise made any effort to ascertain the nature of her mental illness, how it affected her ability to care for her children, whether it was treatable, how it affected her substance abuse, or what services DCS could offer Mother to support her in dealing with her mental illness. Mother's medical records from SEMHC prior to the children being taken into protective custody show that Mother had been diagnosed from the age of sixteen with a daunting mental illness, schizoaffective disorder. Her

mental illness resulted in hallucinations, paranoia, depression, and suicidal thoughts. These medical records showed that Mother's symptoms, though serious, were responsive to treatment and controllable with prescription medication. The records noted her substance abuse, diagnosing it as "comorbid addiction," that is, self-medicating to address the symptoms of her mental illness. Thus, the records prior to the children being removed from Mother's custody strongly indicate that the root problem is her mental illness, and that it is treatable and controllable with proper medication.

The medical records prior to 2000 also allude to Mother's conflicts with Grandmother and Mother's perception that Grandmother was negative toward her and did not support her. Thus, the records indicate that, assuming that placement of the children in Grandmother's custody was best for the children, it would result in obstacles to Mother's recovery that would need to be addressed by DCS.

It is unclear whether DCS made any attempt to find out any of this information, or whether DCS was aware of the information and simply ignored it. Regardless, the initial permanency plan for the children stated that the "event" that led to protective custody was Mother's drug problem, not the underlying mental illness. Under "Services Needed" regarding Mother's drug abuse, the permanency plans list no services to be provided to Mother; rather, they state that Mother was responsible for arranging for and completing drug treatment and parenting classes. Under the "Services Needed" section of the plans on Mother's mental illness, they state that it was *Mother's* responsibility to get her own mental illness evaluated and Mother's responsibility, unassisted, to follow through with treatment recommendations from SEMHC. The children were placed with Grandmother, and the permanency plans give no indication of DCS providing counseling or other measures to address the difficulties between Mother and Grandmother and the problems the children's placement created for Mother's recovery. The permanency plans include no notations of actions to be taken by DCS other than receiving Mother's requests for visitation.

The next several sets of permanency plans appear to be nearly identical copies of the initial permanency plans, with no indication that DCS had acquired any knowledge of the nature of the challenges facing Mother, the type of mental illness she suffered, or her prodigious efforts to obtain medication and treatment and stay drug free.[16] In May 2002, the language copied from the earlier permanency plans is scratched out with a handwritten notation that Mother completed drug treatment and got her mental health evaluated. Subsequent permanency plans for the next three years note that Mother had a history of drug abuse and do not even mention her mental illness. They indicate that DCS's only contacts were with Grandmother. The plans again list no services to be provided to Mother by DCS.

Consistent with the permanency plans, and despite the serious mental illness and other challenges Mother faced, the "Affidavits of Reasonable Efforts" filed by DCS during this period of several years in fact listed no efforts by DCS or services provided to Mother by DCS. Instead, in the spaces in the form affidavits for listing services necessary to reunite the family and services DCS has

---

[16]At trial, DCS representative Jackson said only that Mother went to SEMHC "a couple of times."

provided, the affidavits list *Mother's* responsibilities. The Juvenile Court's findings that DCS was making reasonable efforts to reunify the family were apparently based on "reasonable efforts" affidavits that list little or no efforts to assist Mother.

This is echoed in the testimony of the DCS representative at trial. In response to questions from the state's attorney to establish DCS's "reasonable efforts," DCS representative Jackson could cite only its purportedly "diligent search" to locate Mother. As noted above, the "diligent search" consisted of asking Grandmother Mother's whereabouts, not the children and not SEMHC.

During this time, the record shows that Mother was often in contact with her mental health provider, got herself treatment for her mental illness and the comorbid addiction, and acquired stable housing, despite the challenging nature of her mental illness and the lack of any assistance from DCS. Periodically life events would knock Mother off track, such as hospitalization from a vehicular accident or a stroke; she would lose her housing, sometimes go off her medication for her mental illness, and sometimes relapse into substance abuse. She would pick herself up, seeking assistance from Grandmother or even seeking assistance in acquiring housing and food from SEMHC, even though SEMHC was charged only with treating her mental illness. Eventually Mother would regain her footing until another life circumstance knocked her off track. There is no indication in the record that Mother sought assistance from DCS in any of these matters. This is not surprising under the circumstances. DCS appeared content to simply allow the children to remain in foster care with Grandmother and leave Mother to fend for herself.

Subsequently, in 2006, DCS determined that Mother had completed all necessary tasks and filed pleadings to return custody of the children to her and referred her to ICC for A & D treatment. A few months later, DCS discovered that Mother had a positive result on a drug screen. After quickly making referrals for Mother for drug treatment to three agencies that at the time had no beds available,[17] DCS filed the instant petition to terminate her parental rights. After the termination petition was filed, Mother completed drug treatment, obtained employment, secured housing and paid for the housing. DCS then paid one month's rent for her, but continued to press forward with the termination proceedings. From the record, that is the sum total of the services provided to Mother by DCS.

During the eight-year period in which the children were in State custody prior to trial, at no point did DCS provide Mother with *any* services to address the root problem, her mental illness. Indeed, at no point during the proceedings in the trial court below did DCS present any testimony or evidence showing that DCS ever looked into the nature of Mother's mental illness, the recommended treatment, whether her symptoms were controllable with medication, or how her mental illness may have contributed to her relapses into substance abuse or periodic lack of housing.

---

[17] Later, a bed became available at one of the agencies and Mother declined. Mother then arranged to receive residential drug treatment at CAAP, and the petition to terminate was filed while she was in treatment.

In prior cases, this Court has emphasized the need for DCS employees to "use their superior insight and training to assist parents" in remedying the problems that lead to removal of the children. *In re C.M.M.*, 2004 WL 438326, at *7. This is particularly true where the parent suffers from mental illness. The mental illness necessarily compromises the parent's ability to address her own problems; a parent with serious mental illness cannot reasonably be expected to simply lift herself up by the bootstraps with no assistance. *See, e.g., In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837, at *6-10 (Tenn. Ct. App. Dec. 13, 2007). Here, the assistance provided by DCS was not simply inadequate; there was a complete failure to provide any assistance at all to Mother with her fundamental challenge, her mental illness.

Under these circumstances, we must conclude that the State failed to carry its burden of proving by clear and convincing evidence that it made reasonable efforts to reunify Mother with the children in this case. In the absence of such proof, we find that grounds for the termination of Mother's parental have not been established. The holding of the trial court is reversed, and the petition for termination of Mother's parental rights is dismissed.

This holding pretermits all other issues raised on appeal.[18]

---

[18]While it is certainly questionable whether DCS established by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest, in view of our holding on reasonable efforts, we need not reach the issue of best interest.

## V. Conclusion

The decision of the trial court is reversed, the petition for termination is dismissed, and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are to be taxed against the Appellee State of Tennessee Department of Children's Services.

_____
HOLLY M. KIRBY, JUDGE